The petitioner has suffered from egregious prosecutorial misconduct. He was induced by a prosecutor's promise to surrender his constitutional rights by completing ten proper sessions in a court of law. He was prompted to authenticate his 59-page proper statement before a grand jury in cooperating with the government. So, and it's interesting, this court actually framed this issue when it certified the issue. He was promised at the first proper session, the prosecutor told him that if you complete all the proper sessions, I'll enter a 25- to 30-year plea deal after that point. So this was ten proper sessions that he completed over the course of a year and a half. And the district court found that he, in fact, did complete all his proper sessions. So from the beginning, the petitioner would have accepted that plea deal. Instead, he was indicted, tried, convicted, and now serves a life sentence in a federal prison. And this constitutional deprivation was compounded by his counsel's repeated errors and violations of professional standards of conduct. The petitioner was between a rock and a hard place. So first, I'm going to discuss the prosecutor's broken promise to the petitioner. Now, under Eliason, this court has said that due process requires that a prosecutor scrupulously adhere to his commitments to suspects that induces them to surrender their constitutional rights in exchange for providing evidence that benefits the government. So at that first proper session, the prosecutor made the promise to the petitioner, if you complete all proper sessions, you'll receive a plea deal. And again, the district court found that he completed all proper sessions. Did he accept that promise? Yes. In fact, he signed the proper agreement. Now, I don't want there to be confusion. The proper agreement gave immunity based on his testimony. Now, after he signed that, after he signed it, at the first proper session, the prosecutor said, look, if you complete all of this, you have life eligible, capital eligible offenses. If you complete all the proper sessions, I'll enter a 25- to 30-year plea deal for you. And that's what compelled him. The fact that he was facing possible sentence to death, that's what compelled him to cooperate. And it was an oral promise? It can be understood as an oral promise to enter a formal plea deal at the completion of the S.R. An offer to make an offer, he misses. Correct. An offer he couldn't refuse. So what happened was— What about the long time? Wasn't there a phrase, you served a long time? That's—I'm sorry. Prosecutors did. For a defense case. So the prosecutor said that he would—we're talking about the plea deal right now? He didn't want to. Correct. So what actually the plea deal was, the offer was 25 to 30 years. And what instead happened, he said he was indicted, and he was sentenced to life in prison. After he stopped cooperating, right? Right. So I want to clarify that point. So the petitioner testified twice before he ran jury, and he signed and authenticated all 59 pages of his proper testimony that was developed over those 10 sessions in a year and a half. So the point is that he fully cooperated with the government to the extent that the government received the full benefit of all 59 pages of his proper testimony. And basically, you know, he was the first to come forward of all the co-defendants, and the government fully benefited because they used that testimony to get convictions across the board against all 15 of his co-defendants. But—so here's the reason that I wanted to— But he interrupted this grand jury testimony and refused to continue. That's exactly what I was about to tell you. Yes, Your Honor. He went through the process, and he didn't see it through to the extent there was any kind of promise from the prosecution, which is completed by the proper letter. But, you know, even setting that aside, he did all of his end of the bargain. So, Your Honor, I think there's two points to that. First is that the record shows that it was after the signing of the proper letter that the prosecutor told the petitioner—made his promise to enter a plea deal at the conclusion of the proper session. But the other point was that the petitioner was actually—he fully cooperated, but he was forced—he fully cooperated in that he authenticated his proper testimony for a grand jury. But he was forced to stop testifying, and what that means is he was—he did not attend his last grand jury hearing because at the second session of the grand jury hearing—this is on the transcript, the supplemental appendix 26—the prosecutor told the petitioner that you may be prosecuted for your testimony today. So that would frustrate the very purpose of his cooperation. He approached the prosecutor at the end of that hearing and asked him to confirm, you know, will I be prosecuted if I testify more before the grand jury? And the prosecutor refused to answer that question. Instead, he said, I hold all the cards. You just have to continue to cooperate. So that's the problem. He made—the prosecutor rendered it impossible for him to continue to cooperate. There was full cooperation. The district court found that there wasn't perfect cooperation. But the key point is the governor received the full benefit of his proper testimony, which was authenticated, and he received nothing in return. He had to run about for a while. All this was known to defendant and presumably to his later counsel after Mr. Morrelli, and none of this was raised before the district court before trial or in a direct appeal. Why should we not treat the attack on the prosecutor as fortunate? Your point is well taken, Your Honor. So under Theodora, which was cited by the respondent, there is no procedural default when raising a claim for the first time on collateral appeal if two conditions are met. First, there's a plausible explanation constituting good cause, and second, there's prejudice stemming from a constitutional violation. It's important to look at the facts of Theodora, which is total— Okay, go ahead. If Your Honor— Go ahead. Okay, so just—and this is a really important point. In Theodora, the record clearly showed that the petitioner and his counsel knew the petitioner was sentenced based on inaccurate sentencing information before the last sentencing hearing. In this case, there's a plausible explanation. There's no evidence in the record that either the petitioner or any of his counsel were aware of those facts that would give rise to a prosecutorial misconduct claim. When the defendant says, the prosecutor broke the promise to me, how can he not know about the basis of the claim? So Your Honor, I think a piece of looking at that is that he was not aware that he had a claim for prosecutorial misconduct, and the other part is that he was relying on— He had to know that he thought the prosecutor had broken his promise, correct? That's correct. He wasn't aware of the due process violation. So it's forfeited unless the defendant understands the applicable law? Well, so what I would say—I think the most important point is that the record is silent as to whether he is aware. And I guess if Your Honor, if we had to take that—the standard that you're suggesting, I don't believe that you would ever be able to get past the procedural default. The way that I look at it. Oh, let's take, for example, a breaking claim. That would easily satisfy that requirement. Very good, right? Yeah, under those circumstances, yes. But I think the other critical difference with Theodoro is, again, there's no evidence on the record that—and let's just bear in mind that the petitioner, you know, he didn't have a high school diploma. He ultimately had to cobble together this 2255 petition himself. And that is when he kind of put the ideas together in his head that, okay, yes, these facts fit together and there is a prosecutorial misconduct claim. There's no evidence on the record that he was aware that there was specifically a promise broken and he had suffered from prosecutorial misconduct. But I want to look at the other way that we can get past the procedural default issue, which is under Gillian. This court stated that the petitioner may raise a claim in collateral appeal for the first time if being limited to the trial record on direct appeal would render the claim futile. So in this case, this is pretty straightforward. The 2255 petition was absolutely necessary for any chance of successful appeal to show the following three things. First, the prosecutor made a promise to the petitioner. Second, the petitioner completed all proper sessions and the district court found this was the case and it relied exclusively on the petitioner's affidavit in this petition. And third, the prosecutor in fact violated the promise. So the trial record is completely silent to all these points, so there would have been no basis for raising the prosecutorial misconduct claim on direct appeal. We have lots of cases where these claims are raised in the district court at the time of trial or in a post-verdict motion and the record is made then. In other words, the whole reason required to be raised in the district court is so that the record can be made. You can't bootstrap it and say, well, the record is silent. The reason the record is silent is because it wasn't raised by his trial counsel. Once he stopped co-operating and rallies out, a new counsel comes in and he starts raising the sovereign citizen defenses and all the rest of it. He's in possession of all the facts of this alleged promise and the breach of the alleged promise. And it was well within his power to alert his new attorneys to the fact that he thought he had this agreement and the prosecution had violated it. And if they had made that motion, there would have been either pretrial litigation of the motion or a post-verdict litigation of the motion. It was incumbent on him to raise it. He didn't do it. Your point is well taken here. I see that my… Oh, right. Okay. So, again, I still see that, you know, two responses. First, there's still, you know, ineffective assistance of counsel is one of the claims in this case. And a piece of that has to do with his communication with his client. So it's entirely unclear whether those facts were known. They're certainly not in the record. So, again, that puts us in a different state of the board. Well, Brian, you're raising this issue in two ways, on merits and then also by way of an ineffective assistance claim. But at least the merits claim is forfeited. Can I ask, just briefly about the ineffective assistance claim? It seems to me you've got, in theory, in essence, some sort of miscommunication about exactly what Mr. Dellatore was proposing to, whether it was a maximum of 10 years or a minimum of 10 years or something like that, right? It goes well beyond that. And I could… To begin with. Okay. So that's one piece of it, 10 years instead of the 25 or 30 years that the petitioner had said, I just want the plea deal to be authored. Was there any effort after the communications in September where he stops his cooperation, he's getting letters from Morelli, and Morelli's saying, you know, 10 years as a maximum sentence is not going to happen. Was there any effort to clarify the supposed misunderstanding then or within the next three and a half years before trial and sentencing? Well, so this, Your Honor, points well taken, that this ineffective assistance claim was against pretrial counsel because he withdrew and immediately after that the petitioner was indicted. So I want to make sure I'm fully answering your question. But the other point was that he also had a phone conversation with the petitioner. The petitioner announced, I will not be attending this last grand jury hearing if I believe I'm going to be prosecuted. And counsel actually wrote a letter, I believe it's something along the lines of 33, where counsel reports the result of the phone call. Nowhere in that phone call does he assure the petitioner that he won't be prosecuted for the last grand jury hearing. So that's literally the reason why he announced he wouldn't skip it, and his counsel said you just have to keep cooperating but never confirm that the proper letter would protect his testimony. So there was at least a reasonable probability he would have, with that concern addressed, he would have gone there, completed his grand jury testimony, and received the plea deal. Thank you, counsel. Good afternoon. We have pleading support. The district court correctly denied Mr. Dellatore's 2255 motion. It specifically found that the government had made no promise to Mr. Dellatore that it was broken. The only promise that was made to Mr. Dellatore, which he confirmed in his grand jury testimony, was the proper agreement. That what he said, what Mr. Dellatore said to the government and to the agents in the proper session, and in his testimony for the grand jury, would not be used against him in the government's case in chief at trial. That was adhered to. His proper interviews and the information brought by the government during those interviews, as well as his grand jury testimony, was not used by the government in his case in chief. And that promise was conditioned on testimony of the grand jury consistent with his proper. I'm sorry, go ahead. There was a condition in the government's promise, as I read this letter, next to this illustration, that the subsequent grand jury testimony has to be consistent with the proper. Otherwise, all bets are off. Right, well, if the government developed information that he was no longer being consistent and truthful and completely cooperative, then yes, all bets are off. Mr. Dellatore's refusal to continue to cooperate and refusal to come to the grand jury, withdrawal of his attorney, that's what led to the break in the cooperation relationship with the government and led to there being no plea offering. The district court specifically found that, and that's borne out by evidence of Mr. Dellatore's affidavit and papers attached to his motion. Mr. Counsel here refers to the promise of a 25- to 30-year plea deal. That was that AUSA, who was interviewing Mr. Dellatore, did predict that if he continued to cooperate, the government would offer him a 25- to 30-year deal. That was a prediction by the government. It was a prediction by the government in response to Mr. Dellatore's questions of how much time am I going to have to serve? And the initial answer was a long time. And Mr. Dellatore pressed the prosecutor and he said, well, 25 to 30 years. But he added, look, Fern, I'm holding all the cards here. And in a later interview, told Dellatore, I'm not going to give you a plea deal. I'm not going to give you a written plea offer until this is completed. Now, the coming of this amounted to prosecutorial misconduct for breach of a plea agreement or a plea offer has been defaulted for failure to raise in the district court or under appeal. Certainly, Mr. Dellatore was aware, would have been aware had there been such a deal in place. He would have been aware that when he got, and certainly no later than the time he got sentenced to life in prison, that this deal had been breached. There was no such deal. And that explains his failure to raise it in the district court. Well, what about his claim that he was threatened with prosecution? That's why he, in the midst of his grand jury testimony, and that's why he didn't come to the third grand jury session. That he was threatened? That the prosecutor threatened to prosecute him based on what he testified to in the grand jury. And that's why he refused to come to the third session. Now, I don't think that's borne out by the evidence, Your Honor. Certainly, the district court did not find that. I think what that's based on is the government, the prosecutor's advice to Mr. Dellatore of his rights. That what he said before the grand jury or what he was saying in his testimony could be used against him, right? And that was followed, however, by going over the terms of the profit letter. So when a witness testifies before the grand jury, you want to make sure that the witness is testifying voluntarily, is aware of his rights, and that any agreements are set out on the letter. And that's exactly what happened. Mr. Dellatore was aware of his rights, aware that he did not have to testify, he did not have to incriminate himself, but that to the extent that he was doing so, he was subject to the terms of the profit letter. The government is not going to use that against him in its case in chief. And it didn't. There's no allegation that it did. So there's a defaulted claim on the merits, and the ineffective assistance claim fails for the same reason. Morelli is not in a position to force the government to adhere to the terms of a nonexistent plea agreement. Morelli's role in Dellatore's defense, as the district court found, was effective. He consistently advised Dellatore that once he began, and remember it was Dellatore himself who got himself into this position, by confessing to being involved in three murders, by talking on audio tape with a government cooperator about a murder during the investigation. But then once Dellatore started down the road of cooperating and providing information to the government, Morelli's consistent, sound, reasonable advice was, you have to see this through. Dellatore refused to do that. The government reasonably said that if that's the case, then we're not going to offer you a plea. And that's what led to the breach. Now, as I believe Judge Hamilton pointed out, that happened in September of 2004. This case did not go to trial until, I believe, February of 2008. So there's some three and a half years after this breach of the prosecution, Dellatore's break with Morelli, where had Dellatore believed there was a plea in place, it could have been raised, he could have pursued it further. It just didn't happen. And that can't be blamed on Morelli or on the prosecution. We ask you to affirm the district court's ruling. Thank you, counsel. We'll give you two minutes. Just a couple points here. First, I think there's an important tie-in issue here, and the question is, when did the prosecutor first make his promise, and when did the prosecutor break his promise? The prosecutor made the promise at the first proper session, after the proper letter was signed, at the first proper session. That's when he made the promise. If you complete the proper sessions, you'll receive the plea deal. Now, what we just heard the respondent say was that the promise was broken during the proper sessions, before the petitioner had finished performing. That's simply not the case. In fact, that specific quote, I owe all the cards, that happened after that second grand jury hearing, when the prosecutor had threatened prosecution. Okay, so there's an issue with the timeline. It's very crucial to note that the petitioner had completed, completely performed his side of the deal, finished all proper sessions, before the prosecutor broke his promise. And it's important to consider the effect of this, which is what this court said in Traynham, that it's a due process violation when a suspect reasonably and detrimentally relies upon a prosecutor's promise. And furthermore, that we must hold the government to its agreements that cause defendants to take other damaging actions, besides inducing them to plead guilty. So in this case, petitioner faced life-eligible and capital-eligible offenses, so the 25- to 30-year plea deal was very compelling. And he took a truly damaging action when he acted as a government's witness, okay, over a year and a half, completed 10 proper sessions, and authenticated that before a grand jury that was used to convict all 15 co-defendants, and he put his life and his family's life in grave danger, and he received nothing in return. If there's no further questions, I urge this court to reverse the district court's ruling. Thank you. Thank you for your time. Case is taken under advisory.